ELLIOTT v. A. J. SMITH CONTRACTING COMPANY, INC.

1. APPEAL AND ERROR—INSTRUCTIONS—MISCARRIAGE OF JUSTICE.
   The Supreme Court is not reluctant to reverse the decision rendered in a trial court, where a miscarriage of justice has resulted due to a misconstruction of the law by the trial judge when instructing the jury, but the Supreme Court is not disposed to parse the trial judge's grammar or reverse for the misspoken word or the inartistic phrase.

REFERENCES FOR POINTS. IN HEADNOTES

[1] 3 Am Jur, Appeal and Error § 837.
[2] 5A Am Jur, Automobiles and Highway Traffic §§ 1100, 1101.
[3] 16 Am Jur, Death § 364.
[4, 5] 5A Am Jur, Automobiles and Highway Traffic §§ 945–947.
   Evidence of specific acts or reputation as admissible to prove incompetency of motor vehicle driver, or defendant's knowledge thereof, in action against one permitting alleged incompetent to drive. 120 ALR 1311.
[6] 5A Am Jur, Automobiles and Highway Traffic §§ 290, 1098.
[7] 5A Am Jur, Automobiles and Highway Traffic § 987.
[8, 9] 53 Am Jur, Trial §§ 452, 460, 463.

2. Automobiles — Death — Instructions — Negligence — Proximate Cause.

Instruction in action under death act was not error, when the whole charge is considered, where it presented to the jury plaintiff's 2 theories of negligence of defendant company (1) in entrusting a dump truck to an employee unfit to operate it and (2) defendant's vicarious liability for negligence of an employee acting within the scope of his employment proximately causing the death of plaintiff's minor decedent (CL 1948, §§ 691.581, 691.582).

3. Death—Instructions—Construction of Statute—Proximate Cause—Negligence.

Instructions in action under death act, when considered as a whole, *held*, not to be subject to construction that jury could find that estate of anyone who dies has a cause of action irrespective of whether or not someone was negligent, where portion of charge specifically required the jury to find that defendant's dump truck driver's negligence must have been the proximate cause of the decedent's death (CL 1948, §§ 691.581, 691.582).

4. Automobiles—Evidence—Past Driving Record of Dump Truck Operator.

Admission in evidence in action under death act against employer of dump truck driver of the driver's past driving record, over objection by defendant, *held*, not error, where plaintiff pleaded negligence of defendant in that it had employed a person totally incompetent to handle the truck (CL 1948, §§ 691.581, 691.582; CLS 1956, § 257.731).

5. Evidence—Conviction of Automobile Operation Offenses—Civil Action—Construction of Statutes.

The statute prohibiting admission in evidence in any civil action of the conviction of any person for any violation of statute or ordinance offense involving the operation of motor vehicles does not bar the reception of evidence of a driver's driving record in an action under the death act against the driver's employer, where the negligence of the defendant that was pleaded was that it had employed a person totally incompetent to handle the dump truck involved (CL 1948, §§ 691-.581, 691.582; CLS 1956, § 257.731).

6. Automobiles—Assured Clear Distance Ahead—Instructions—Sudden Appearance of Pedestrian in Lane of Travel.

Instruction in action under death act for loss of a 5-year-old child which, in effect, explained dump truck driver's duty.to

use due care, including in such explanation his duty to be able to stop within the assured clear distance and that such assured clear distance rule had no application if the child suddenly appeared in the driver's lane of travel or line of vision *held*, not error, under record presented (CL 1948, §§ 691.581, 691.582; CLS 1956, § 257.627).

7. SAME—DUMP TRUCK CABS—VISION OVER NEARBY CARS—EVIDENCE.

Refusal of permission to defendant's dump truck driver to testify as to his ability to see over the top of a car to his left was not reversible error, where based on a self-serving "test" made a few days before the trial in the same truck cab involved in action under death act for death of plaintiff's 5-year-old decedent, although plaintiff's expert witness, a driver training instructor, had never seen the truck involved, and had testified, over defendant's objections, as to opinion that a truck driver so situated in an elevated truck cab, had a clear and unobstructed view of the road ahead, and defendant's driver was not only not qualified as an expert but had been shown to have had a bad driving record, had testified as to what he did see at time of accident, and admittedly was then unaccustomed to that type of truck (CL 1948, §§ 691.581, 691.582).

8. TRIAL—ATTORNEY AND CLIENT—ARGUMENT TO JURY—DISCRETION OF COURT.

The art of advocacy is the art of persuasion, it being counsel's duty to use all legitimate means to convince the jury or the court that a finding for his client will be in accord with justice, the line between a highly persuasive, but fair, argument and an improper appeal to passion being so difficult to draw that counsel must be given some leeway, of necessity, the matter being peculiarly one for the discretion of the court (Canons of Professional Ethics, No 15).

9. SAME—ARGUMENT TO JURY—REFERENCE TO BIBLE.

Argument to jury in action under death act for loss of 5-year-old boy *held*, not improper, inflammatory, or prejudicial because couched in Biblical terms as to the value of the life of a child, where there was no attack upon anyone's faith or creed (CL 1948, §§ 691.581, 691.582).

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from Wayne; Bohn (Theodore R.), J. Submitted June 5, 1959. (Docket No. 40, Calendar No. 47,782.) Decided January 4, 1960.

Case by Carl J. Elliott, administrator of the estate of John I. Elliott, deceased, against A. J. Smith Contracting Company, Inc., a Michigan corporation, for damages under the death act as result of accident involving motor vehicle and minor child on highway. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*John T. McWilliams,* for plaintiff.

*Cary, BeGole & Martin (David V. Martin,* of counsel), for defendant.

KELLY, J. (*dissenting*). Plaintiff's 5-year old son suddenly darted across Telegraph road into the left rear wheel of defendant's truck and was instantly killed, on March 10, 1955.

Telegraph road is a heavily traveled highway with 2 lanes for northbound and 2 for southbound traffic. The accident occurred on the outskirts of Dearborn, where both sides of the road were undeveloped.

Defendant, a road and sewer contractor, was engaged in construction work in the vicinity of Michigan avenue, west of Telegraph. Defendant's employee, Hunter, was driving north in the extreme right lane and a Mrs. Devereaux was driving her Oldsmobile passenger car north in the lane to his left. Just prior to the accident the front bumper of defendant's truck was adjacent to the extreme rear of the Devereaux car.

Deceased, with a playmate, suddenly darted from the west shoulder of Telegraph road and crossed the southbound lane where the playmate stopped before entering the northbound lane, but deceased continued on.

Mrs. Devereaux, being warned by her passenger friend, applied her brakes, thus narrowly missing deceased.

A witness, who was driving a truck about 150 feet behind defendant's truck, testified: "The next thing I knew the little boy came from in front of the Oldsmobile into the left rear duals (and) was completely, just washed around the wheel."

The posted speed for Telegraph road at this point was 35 miles per hour and there was only 1 witness who testified, over defendant's objection, that defendant's driver exceeded that speed, stating that while he did not see defendant's truck previous to the accident he was of the opinion that it must have been traveling between 35 and 40 miles per hour because he (witness) and all other drivers on Telegraph road proceeding north were traveling at that speed.

Defendant's driver, testifying as to when he first saw deceased, stated:

"When I first saw him he was about a foot in front of that car and the car was obstructing my view and that hood was obstructing my view because I never noticed him until he cleared that hood of that car. The first time I seen him was I had a glance of him over that right front fender of that car and he was—he was running, and that is when I first seen him, when I seen him, man, I just laid on the brakes and turned the steering wheel and I was watching him as far as I could."

The mothers of the deceased and of the deceased's playmate testified that defendant's driver told them the next day after the accident that he saw the 2 boys go to the center of the road; that 1 boy stopped and went back; that he heard a horn blow and the next thing he knew deceased had run toward and into his truck.

Appellee contends:

"Defendant's driver, Everett R. Hunter, mounted in the cab of the dump truck, was elevated sufficiently so that he could look out over the top of passenger cars beside him and enjoy clear and unobstructed vision of the entire 4-lane highway above and beyond the view afforded the drivers of an ordinary passenger vehicle."

After a day and a half of deliberations, the jury awarded plaintiff damages of $20,000.

Appellant requests this Court to reverse the verdict and remand for new trial, alleging that the trial court erred 3 times in either admitting or rejecting testimony; 4 times in erroneously instructing the jury; that the plaintiff's argument to the jury was inflammatory, improper, and prejudicial; and, because of all of these cumulative errors, the court erred in not granting defendant's motion for a new trial.

Claimed Error 1: *The trial court gave an erroneous, confused and misleading instruction in regard to the wrongful death act.*

The action was brought under the wrongful death act (CL 1948, §§ 691.581, 691.582 [Stat Ann 1957 Cum Supp §§ 27.711, 27.712]). This act did not establish a new theory of liability but removed the common-law barrier as to who might sue to recover damages because of another's wrongdoing.

A proper instruction would have clearly advised the jury that the wrongful death act allowed the plaintiff to recover, if the testimony proved the defendant guilty of negligence and that such negligence was the proximate cause of decedent's death.

The court instructed the jury as follows:

"The plaintiff alleges that the defendant is liable under the death act by reason of the fact that the truck was being driven by a driver who was a dozer operator; or that the defendant is liable for the

driver's negligence in operating the truck at excessive speed and in not having his truck under control; and failure to make reasonable observation as to the presence of others in the highway; and failure to stop within the assured clear distance ahead. * * *

"The plaintiff, in order to recover, has the burden of proof to establish his case by a preponderance of the evidence, in that the defendant is liable under the wrongful death act, or that the driver's negligence in the operation of defendant's dump truck, was the proximate cause of the injuries and death of John I. Elliott."

The court erred in so instructing because the instruction allowed the jury to conclude that they could find for plaintiff on 2 theories—either negligence or the death act.

Claimed Error 2: *The trial court erred in permitting examination of defendant's driver concerning his past driving record and license revocation.*

Over objection, plaintiff was permitted to establish that defendant's truck driver's driving license was revoked on November 9, 1949; for a period from August 28, 1950, to September 21, 1953; that the truck driver did not remember whether or not he was convicted of reckless driving on the 31st day of July, 1953; that the truck driver was denied his application for a chauffeur's license on March 31, 1954.

CLS 1956, § 257.731 (Stat Ann 1957 Cum Supp § 9.2431) provides:

"No evidence of the conviction of any person for any violation of this chapter or of a local ordinance pertaining to the use of motor vehicles shall be admissible in any court in any civil action."

The statute is clear and explicit. The question for the jury was whether at the time of the accident defendant's driver was operating the truck as a rea-

sonable, prudent man would operate it. Allowing testimony contrary to the express legislative prohibition was prejudicial to defendant.

Claimed Error 3: *The court erred in instructing the jury in regard to the assured clear distance rule.**

In *Corpron* v. *Skiprick,* 334 Mich 311, 318, we stated:

"Under defendant's proofs plaintiff was not, prior to the impact, ahead of the automobile. Rather, he was at one side. If such was the situation, and the jury might well have concluded that it was, whether defendant was guilty of negligence because of his failure to observe plaintiff approaching from his left was, under all the circumstances of the case, an issue of fact. It may not be said that the statutory 'assured clear distance ahead' rule was necessarily applicable in the case."

What we said then we repeat now as applicable to this appeal. The record proves beyond dispute that the only question for the jury was, as stated in *Corpron* v. *Skiprick, supra,* "whether defendant was guilty of negligence because of his failure to observe plaintiff approaching from his left." The assured clear distance rule should not have been interjected into the case by the court's instruction.

Claimed Error 4: *The trial court erred in permitting plaintiff's witness to give his opinion concerning observation from defendant's truck and denying defendant's driver an opportunity to express his opinion on the same matter.*

Plaintiff's witness, without ever having seen the truck here involved, was permitted, over the defendant's objections, to express an opinion as to the ability of defendant's driver to see over the top of a

---

* See CLS 1956, § 257.627 (Stat Ann 1952 Rev § 9.2327).—REPORTER.

car to his left, and the record discloses the following answer:

"*A*. Any person sitting in any kind of a truck—this kind of a truck—it's according to their height; they can see from 12 to 18 inches above automobiles, and should be able to see, if the car is beside of him or a short ways in front of him, anything beyond the curb to the left and right.

"*Mr. Martin:*  Well, I object to the answer.  *  *  *

"*The Court:*  The objection is overruled."

The court refused defendant's driver the right to testify expressing a contrary opinion after he made his test a few days before the trial, in the same cab involved in the accident, and at the same place of the accident. The trial court erred in denying the same privilege to defendant that was granted to plaintiff.

Claimed Error 5: *The trial court should have granted a new trial because of cumulative error during trial finally being accentuated by the plaintiff's improper, inflammatory, and prejudicial argument to the jury.*

This Court has held "that the parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice";[1] that prejudicial statements "should be promptly suppressed by the court, whether opposing counsel object to them or not";[2] that "it is not proper to interject irrelevant remarks, calculated, if not designed, to prejudice the jury upon the merits of the case";[3] and in *Britton* v. *Michigan Central R. Co.*, 118 Mich 491, 492, we said:

"The circuit judge seems to have overlooked the responsibility resting upon him to see that the defendant had a fair trial, and allowed counsel to

---

[1] *Layton* v. *Cregan & Mallory Co., Inc.*, 269 Mich 574, 583.
[2] *McDonald* v. *Champion Iron & Steel Co.*, 140 Mich 401, 415.
[3] *Ward* v. *Reed*, 134 Mich 392, 394.

present the case to the jury in a way calculated to arouse their prejudices."

Plaintiff's attorney seized upon the fact that he was arguing to the jury during Holy Week, by saying: "I suppose I cannot and I should not pass this occasion without taking cognizance of the fact that this is the first Monday, this is Holy Week, and that as you know it ends on Good Friday, and then the glory of the Resurrection of Easter;" and quoting extensively from the Bible, continued " 'And whosoever receiveth one of these little children in My name, receiveth Me; and whosoever offendeth against one of these, My little children, it is better for him that he would have a millstone cast about his neck and that he were drowned in the depths of the sea' "; and concluded by stating:

"And then, finally, when it comes down to the aspirations that we all hold for the better and bigger things in life, and all week long you are going to hear from the churches throughout the nation, throughout all Christendom, you are going to hear the message of the value of One Life, and, come Friday, all you have to do is look on the walls of this building, and you will see that 'We will close from 12 o'clock to 3, Friday,' Good Friday. Why? The value of life, and the value of That Life there has made our lives better for 2,000 years; and I say to you that when our churches say to us, as they do so quite correctly and honestly, to evaluate and express your love and devotion in terms of the generosity of your gift, and the helping to build these temples to God Almighty, and the temples of healing in the forms of our hospitals, and so forth, they are in effect saying to you 'Equate it in terms of money.' * * *

"Believe me, you will make every road safer, and every highway safer if you thunder forth your verdict, 'We find for the plaintiff, and the damages are as asked for, $50,000.' "

The argument was improper, inflammatory, and prejudicial and should not have been made or allowed by the trial court.

Because of the nature of the case and cumulative error, we reverse and remand for a new trial, and hold that the remaining claimed errors are without merit.

Reversed and remanded for new trial. Costs to appellant.

DETHMERS, C. J., and CARR, J., concurred with KELLY, J.

SMITH, J. The facts are as simple as they are appalling. A 5-year-old child and his playmate wandered onto a heavily-traveled highway. Proceeding from the west shoulder they crossed the 2 southbound lanes in safety. Eventually, since they were walking, and walking slowly, they reached the center of the highway. Here they paused. The car closest them (in the northbound lane), driven by Mrs. Devereaux, came to a complete stop. One boy stood still. The other, Johnnie Elliott, continued across at a more rapid rate.

But slightly behind and to the right of the Devereaux car approached a truck belonging to defendant. It was being driven by Everett Hunter. He, it was testified, admitted that he was unaccustomed to this truck "because he was a bulldozer operator." He had a bad traffic record. He hadn't kept any track of the times his license had been revoked or suspended, at least "not an accurate one, no." Despite the fact that many others on the highway clearly saw these children, despite the fact that the Devereaux car which was closer to Johnnie than defendant's truck, stopped for him, and despite the fact that Hunter was sitting in an elevated cab with an unobstructed vision of 500 feet and upwards, in

daylight, on a clear day, his truck killed the boy. Despite much study of the record and exhibits it is incomprehensible to me why, if the Devereaux car, which was closest to the boy, was able to stop and let him proceed in safety, the defendant's truck was not, and it is even less comprehensible how, despite the care with which the trial was conducted, and the verdict of the jury, we are able to find the miscarriage of justice required for reversal of the case.

A jury, as we noted, found liability. In our Court it is urged that the judge committed errors so harmful to the truck owner that there must be a new trial. If, indeed, the trial judge has so misconstrued the law that a miscarriage of justice has resulted as to either party, we are not reluctant to set it straight. We are not, however, disposed to parse his charge for its grammar, reversing for the misspoken word or the inartistic phrase. If the law has been fairly stated, we will not reverse because a doctorial thesis in law might have put it more elegantly. If the court has permitted a reasonable evidentiary showing by both parties, the fact that he has pruned the testimony a little here and let it flower a little there will not cast the case into outer darkness if, on the whole, justice has been done. These are not new principles, but old, so old in fact that they have been allowed to grow tarnished and rusty.

The case before us is a near-perfect example. The circumstances surrounding this boy's death could hardly, short of deliberate attack, have been more reprehensible. The problem presented by the case, the death on the highway, is one of our most pressing social problems. The verdict was well justified upon the evidence. Yet, despite all of this, we are urged to countermand the jury's verdict because of "errors" which, upon examination, are seen not to be errors at all in the sense we require for reversal but merely the normal give and take of a hotly-con-

tested trial. The most serious, indeed, is a mere matter of grammar. It is adequately answered by Webster's dictionary. From this high point the errors descend, in decreasing order of legal importance, to the content of plaintiff's argument to the jury. With respect to it the objection seems to be that since it was good enough to win, it was bad enough to be prejudicial.

We will examine the alleged errors in order:

Claimed Error 1: *The trial court gave an erroneous, confused, and misleading instruction in regard to the wrongful death act.*

Appellant claims that the instructions allowed the appellee to recover on either of 2 theories, 1 of which was erroneous.

The complained of portions of the charge were the following:

"The plaintiff alleges that the defendant is liable under the death act by reason of the fact that the truck was being driven by a driver who was a dozer operator; or that the defendant is liable for the driver's negligence in operating the truck at excessive speed and in not having his truck under control; and failure to make reasonable observation as to the presence of others in the highway; and failure to stop within the assured clear distance ahead. * * *

"The plaintiff, in order to recover, has the burden of proof to establish his case by a preponderance of the evidence, in that the defendant is liable under the wrongful death act, or that the driver's negligence in the operation of defendant's dump truck, was the proximate cause of the injuries and death of John I. Elliott. * * *

"If you find that the act of the defendant corporation in suffering and permitting Everett R. Hunter, the driver of the truck, to drive the dump truck when they knew or could have known the nature and extent of his driving record, you may find such to be an

act of neglect or default; and if it was a proximate cause of the ensuing injury and death of John I. Elliott, then you may find a verdict for plaintiff and against the defendant.

"Now, with reference to the negligence, if any, of the driver: I charge you that the defendant corporation, as the owner of the dump truck, is also liable for the negligence, if any, of the driver of said truck at the time and place of the accident, there being no question as to the fact that Everett R. Hunter was then and there operating said truck with the knowledge and consent of defendant, and as an employee, agent, and servant of defendant, and engaged in defendant's business; and if you find that the operator of the truck was in any way negligent, and if that negligence was a proximate cause of the injuries and death, then you should find a verdict for plaintiff and against defendant.   *   *   *

"In determining whether the driver, Mr. Hunter, was negligent, it is not to be decided upon Mr. Hunter's past driving record; and I distinguish here between determining this matter on the negligence phrase [phase?] of it, in considering this topic, rather than on the determination of liability under the death statute."

What has been said here?   Simply that plaintiff has 2 theories for defendant's liability: (1) defendant's alleged negligence in entrusting a motor vehicle to an employee unfit to be at the wheel, and (2) defendant's vicarious liability for the negligence of an employee acting within the scope of his employment.   These are 2 perfectly valid theories.   Where is any error?   Defendant asserts that the use of the word "or" in the second paragraph meant that plaintiff had another theory, one not found in the books or in any statute, i. e., that he could recover somehow under the wrongful death act for something the nature of which we are not told, regardless of any negligence on the driver's part.   If true, this is a

serious charge, namely, that the jury was told that
Michigan has something called the wrongful death
act, by virtue of which the estate of anyone who dies
has a cause of action against somebody. But upon
the whole charge, it is perfectly clear that the able
trial judge was indulging no such nonsense, betray-
ing no such legal illiteracy. He was using the word
"or" in the sense of an explanatory word, which,
grammatically speaking,* is a proper use.

However, even assuming that the instruction could
have been interpreted as defendant claims, any pos-
sible ambiguity was clarified by the 3d and 4th para-
graphs of the disputed portion of the charge. These,
as may be seen from an examination thereof, went
on to amplify each of the 2 theories relied on by
plaintiff. Indeed, the trial judge, in this amplifica-
tion process, followed very closely the statement
of law recommended by my Brother in view of the
fact that he informed the jury that, in order for
plaintiff to recover under either theory, it must find
negligence, and further, that such negligence must
have been the proximate cause of decedent's death.
That defendant's negligence in choosing an unfit
driver should entail no liability, unless the driver
was negligent in striking plaintiff's decedent, was
made clear by the trial judge's reference to the need
for proximate causation and the definition of that
term in a later part of the charge.

We will not dissect the rest of the charge. Astute
grammarians will doubtless be able to find other
"errors." Our test is that set forth in *Zebell* v.

---

* See 2 Webster's New International Dictionary (2d ed 1958), *or* b.
"That the defendant is liable under the wrongful death act, that is to
say that the driver's negligence in the operation of defendant's dump
truck": in other words, that the defendant is liable under 1 of the
plaintiff's 2 theories (by virtue of the wrongful death act) if the
negligence of defendant's driver was the proximate cause of plain-
tiff's decedent's death.

*Krall,* 348 Mich 482: we consider the charge as a whole.

Claimed Error 2: *The trial court erred in permitting examination of defendant's driver concerning his past driving record and license revocation.** 

Appellant claims that the admission of evidence concerning its employee's past driving record violated the following Michigan statute:

· "No evidence of the conviction of any person for any violation of this chapter or of a local ordinance pertaining to the use of motor vehicles shall be admissible in any court in any civil action." (CLS 1956, § 257.731 [Stat Ann 1957 Cum Supp § 9.2431]).

The above statute has not been previously construed by this Court.

Even though we were to assume, without deciding, that in a negligence action against the driver himself, evidence of the type mentioned, *supra,* is "evidence of the conviction" of the driver and thus within the proscription of the legislature, such an assumption would not answer the problem here presented.

The principal evils sought to be cured by the statute arise in this way: A driver has been convicted of a criminal offense in connection with a traffic accident. In addition, he is sued civilly with respect to the same accident. There is a danger that the civil jury might, if permitted, consider the criminal conviction as evidence of negligence in the civil action, or, in civil cases, that negligence in a prior case will be regarded as evidence of negligence in a later case. These, principally, are what the statute seeks to prevent. 3 Wigmore, Evidence (3d ed), § 987.

We do not have such a case. Here the suit is brought not against the driver himself but against

---

* The objection upon the statutory ground was raised to the question "Now, Mr. Hunter, isn't it true that your license was revoked on November 9, 1949, for negligence?"

his employer on a totally different theory: his personal negligence in entrusting the operation of a truck to a person totally incompetent to handle it. See *Tanis* v. *Eding,* 265 Mich 94. Section 213 of the Restatement of Agency (2d), states the principle relied upon in the following terms:

"A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is neglient or reckless:  *  *  *
"(b) in the employment of improper persons or instrumentalities in work ·involving risk of harm to others."

Comment *d.* states that:

"The principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him.  *  *  *  The dangerous quality in the agent may consist of his incompetence or unskillfulness due to  *  *  *  his lack of experience considered with reference to the act to be performed."

See, also, 2 Restatement, Torts, § 308.

The best possible evidence, and often the only evidence, of the driver's fitness, or lack thereof, is his own driving record. This is his own doing. He built it. We need not rely upon reputation or opinion. But if we construe the above statute as defendant contends, we must ascribe to the legislature an intent to prevent an injured party's demonstration of the very factor that may have been primarily at fault with respect to his injury, *i.e.,* the hiring, and the entrusting of a motor vehicle, to one incompetent to drive it. In the case before us the driver's license had been revoked for negligence, revoked under the terms of the financial responsibility act, a chauffeur's license had been denied him, and, indeed, his license

had once been revoked while in the employ of this defendant. This, then, was the driver before us who had been entrusted by the defendant with the operation of a powerful motor vehicle on the public highway, an obvious menace to anyone within striking distance of the truck, and this is his driving record which, defendant insists, the jury is not to be permitted to see. The statute does not in terms prevent showing such a record for such purpose and we are not inclined to make out of it a shelter for the unfit, and worse, who are entrusted with powerful trucks in which to roam the highways of this State.

Claimed Error 3: *The court erred in instructing the jury in regard to the assured clear distance rule.**

It is appellant's contention that the trial judge erred in instructing the jury that: "no person shall drive any vehicle upon a highway at a speed greater than will permit him to stop within the assured clear distance ahead." And further that:

"it is not enough that a driver of a vehicle be able to begin to stop within the range of his vision. Or, he use diligence to stop after discerning the object or pedestrian. That rule makes no allowance for delay in action. He must on peril of legal negligence so drive that he can and will discover an object, perform the manual acts necessary to stop; bring the car to a complete halt within the range of his vision."

If we were to stop reading the charge at this point, we would feel called upon to review the facts once more with particular reference to the applicability of the assured clear distance. First completing, however, our reading of the charge itself, we find the court also instructing the jury that:

"Although the assured clear distance ahead rule contemplates continuous operation of a motor vehicle

---

* See CLS 1956, § 257.627 (Stat Ann 1952 Rev § 9.2327).—Re-porter.

at such speed that discernible objects in the path or lane of travel may be avoided by the driver, it does not require the driver to so drive as to be able to avoid a pedestrian who suddenly appears in his lane of travel or line of vision at an intermediate point in such assured clear distance ahead."

What this all boils down to is that the court explains a driver's duty to use due care, including within his explanation the duty to be able to stop within the clear distance. He then goes on to charge in effect the assured clear distance has no application here if the child suddenly appeared in the driver's "lane of travel, or line of vision." Appellant says this is error, that there was no evidence that the child was ever "ahead" of defendant. This is a fly-specking triviality. Far from being such gross error as to invalidate the trial, it is questionable whether it was error at all, and even more questionable, if error, it was harmful to the defendant.

Claimed Error 4: *The trial court erred in permitting plaintiff's witness to give his opinion concerning observation from defendant's truck and denying defendant's driver an opportunity to express his opinion on the same matter.*

Appellee called to the witness stand Mr. John Henderson. He was shown to have had a great amount of experience with the particular type of truck here involved, having driven one between 400,000 and 500,000 miles, and he was, and for some time had been, a driver training instructor. Over objection he was permitted to testify that a driver of the type of truck here involved had, from his elevated position in the cab, a clear and unobstructed view of the road ahead.

Earlier in the trial appellant attempted to have its own driver, Hunter, testify as to the results of a "test" he himself conducted to determine the same fact. This test consisted of Hunter's sitting in the

cab of the truck which he was in at the time of the accident, under conditions alleged to be similar to those present when he struck plaintiff's decedent. The testimony as to what he could see at the time of the experiment was objected to by appellee and excluded by the court. (He had already, of course, testified as to what he was able to see at the time and place of the accident itself.)

Ascribing to this self-serving project, for the moment, the dignity of a "test," we are met at its very threshold by the requirement that a test, to have any probative value whatever, must recreate the original conditions of the occurrence, and the testimony with respect thereto, if beyond the normal experience of the jury, must be interpreted by a qualified expert. McCormick, Evidence, § 169. The proffered testimony fails on both grounds. Here we are asked to believe that this driver, who was unable even to remember how many times his license had been revoked, could, after the passage of several years, so well remember and reproduce the positions of the cars involved, and the deceased boy, as to be able to recreate the incident for the purposes of scientific experiment as to range of vision. And, in the second place, this driver who admitted that he was, at the time of the accident, unaccustomed to this type of truck, has by some process not made clear on the record, now become an expert with respect to it.

All that this amounted to was an effort to clothe the driver, Hunter, in 2 different costumes. First he comes before the court as the driver of the truck which killed the boy. Then he is excused, makes a quick change, and reappears. This time he comes ready to testify as a technician. He has conducted a "test," and he seeks to testify that the tests by Hunter-the-expert corroborates the testimony of Hunter-the-driver.

The witness is versatile, to be sure. But his versatility cannot dispense with the evidentiary requirements for admissibility. It is asserted to us that the trial court's refusal to clutter the record with this pseudo-scientific test by this self-appointed expert amounted not only to error but error so gross as to warrant a new trial. It must be apparent that I am convinced only of the complete worthlessness of the testimony tendered.

Claimed Error 5: *The trial court should have granted a new trial because of cumulative error during trial finally being accentuated by the plaintiff's improper, inflammatory, and prejudicial argument to the jury.*

Appellant contends, finally, that counsel for appellee, in his argument to the jury, "transgressed the bounds of fair and proper advocacy" because of the "highly inflammatory, prejudicial and punitive" nature of his remarks.

The art of advocacy is the art of persuasion. It is counsel's duty to use all legitimate means to convince the jury or the court that a finding for his client will be in accord with justice. Canon 15 of the Canons of Professional Ethics.* The line between a highly persuasive, but fair, argument and an improper appeal to passion is, admittedly, a difficult one to draw. Of necessity, counsel must be given some leeway. *Battishill* v. *Humphreys,* 64 Mich 514; *Shepard* v. *Platt,* 158 Mich 181. The matter is peculiarly one for the discretion of the court.

With respect to the portions complained of, counsel representing the estate of the boy was faced with a difficult and delicate task. He was suing for money damages. What, in dollars, was the value of the life of this boy? Counsel's opening words, in

---

* Am Bar Assoc, Canons and Opinions; 38 Mich State Bar Journal, May, 1959.—REPORTER.

the paragraphs complained of, spoke of his reluctance to discuss the value of life in these terms. "Now," he said, "I must needs come to the question of money." His approach to the value of the life of a child was couched entirely in Biblical terms. In this source he did not lack authority, and he did not hesitate to use it. He could, of course, have argued strictly in monetary, in budgetary, terms. A child eats so much per day. He gets sick and must be treated and nursed. He goes to school and must have books. Upon reflection, however, are not all those expense items? Is there, in truth, any money *damage* suffered?

The question we ask is cold and callous, but it must be asked for it must be answered. Is there a better source for answer than the one counsel used?

We have, it is true, reversed occasionally on the basis of inflammatory arguments concerning religion. We will need not spread examples thereof, the garbage itself, over the printed pages of our reports in order to make our point. Shortly put, we will not countenance attacks upon any faith or upon the members thereof. Our doors are open to all alike and a fair trial, unclouded by extraneous factors of the litigant's creed, is to be accorded each who enters. Occasionally the explanation for reversal, because of arguments involving religion, is made in terms of logic. "There was no logical reason growing out of the testimony why plaintiff's counsel should use the language above quoted," we said in *Nemet* v. *Friedland,* 273 Mich 692, 697. What the court is getting at here is the matter of relevance. And, so far as relevance is concerned, in the portion of the argument before us the value of a child's life was the precise point at issue. The appraisal of its value in the terms here employed is neither novel to our times nor foreign to our teachings.

The cases cited by appellant involving reversal because of improper closing argument by counsel do not support his position here taken. One of them (*Ward* v. *Reed,* 134 Mich 392), an assumpsit action, contains no record of the remarks of counsel. Two of them involve the suggestion of counsel that defendant's conduct was criminal (*Elliott* v. *Detroit United Ry.,* 226 Mich 92; *Layton* v. *Cregan & Mallory Co., Inc.,* 269 Mich 574). Another (*Hillman* v. *Detroit United Ry.,* 137 Mich 184) contained the statement of counsel that the defendant corporation "will resort to lies and perjury." In none of appellant's cases is there any language similar to that objected to in this case. Here there was an express denial of any plea for sympathy at the very beginning of the argument, and there was no charge, or series of charges, of criminality, perjury, or the like, on the part of the defendant or his servant. There was, it is true, a constant reiteration of the circumstances of the tragedy, but upon these facts any counsel failing such emphasis would have been derelict. The argument of which complaint is now made offends no test of prejudice of which I am aware, however phrased. Appellant's real complaint here is of counsel's skill in gauging the receptivity and response of the jury. Not all juries would respond to an appeal phrased in Biblical terms, and, if overdone, it may be more harmful than helpful. That is the chance counsel must take. It does not, however, constitute reversible error to quote the gospel according to Matthew.

This case, it is proposed, is to go back for a new trial. Only those with rugged constitutions will fail to avert their eyes as they pass the spectacle then to be presented. Hunter, the truck driver, will stand before the jury, not as the traffic menace he is, but as a driver with an impeccable record. We will have ruled that his driving record may not be shown.

Then having once testified, he will later reappear. In his reincarnation he will appear, not as one unfamiliar with the truck he was driving, which was the truth of the matter by his own admission, nor even as one moderately familiar, but as an expert thereon who will testify as to a "test" he conducted. This masquerade, also, will have our blessing—more, in fact, than our blessing. We will presumably reverse once more unless the show goes on. The jury, then, having been kept in the dark as to driver Hunter's incompetence, and worse, and having had the benefit of exculpatory testimony by Hunter-the-expert as to the test he performed, will then be permitted to hear argument. But it will be a desiccated argument, a sterile presentation. Mention that a boy's life was lost will, of course, be permitted, despite its prejudicial nature, since it is in the pleadings and there has been testimony thereof, but as to the value of the life, either to the parents or to society itself, there is considerable doubt in my mind as to just what may be said. This much, however, is clear: counsel will avoid, as he would the plague itself, any mention of the scriptures, particularly the gospel according to Matthew, Mark, Luke, or John. Such references will only inflame the passions of the jury, prejudice them against A. J. Smith Contracting Company, Inc., and prevent a fair trial. And over all we suspend the sword of Damocles, the misplaced preposition in the court's charge.

Thus, slowly, in case after case, we trudge towards the apparently inevitable result of the elimination of the automobile negligence cases from consideration by the courts. In our own lifetimes we have seen vast areas of jurisdictions, once belonging to courts and juries ceded to lay agencies and administrative tribunals. In the workmen's compensation cases it was the complete inability of the courts to do even a semblance of rough justice, so bound were

we by ancient "rules" inapplicable to a new and pressing social problem, that led to the transfer of this jurisdiction to other agencies. Already we have a mounting chorus* that the same be done with the automobile negligence cases. For those of us who believe that a court of justice is the best place for our people to obtain justice the result is to be deplored. Yet, on the other hand, multiply this Johnnie Elliott case a thousandfold and a doubt arises, a haunting, oppressive fear that possibly, in truth, our people and their problems in this area are already beyond our help, that they must turn elsewhere.

For myself I hold that the case was fairly tried to an impartial jury by skilled counsel and before an able judge. More I will not ask. Of error there is none, far less the miscarriage of justice that we must find before we reverse a case. The judgment is affirmed, with costs to appellee.

BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred with SMITH, J.

---

* *E.g.,* Green, Traffic Victims: Tort Law and Insurance, 63–85.