Ben KNOEPFLE, Plaintiff and Respondent,

v.

Edwin SUKO, Executor of the Last Will of
Reinhold Suko, deceased, Defendant
and Appellant.

No. 7863.

Supreme Court of North Dakota.

March 2, 1961.

Rehearing Denied April 21, 1961.

Duffy & Haugland, Devils Lake, for defendant and appellant.

Hjellum, Weiss, Nerison & Ottmar, Jamestown, for plaintiff and respondent.

BURKE, Judge.

This is a suit for damages for injuries received by the plaintiff in a collision be-

tween an automobile driven by him and an automobile driven by Reinhold Suko deceased. Trial of the action resulted in a verdict and judgment in favor of the plaintiff in the sum of $12,530.

Defendant made a motion for a new trial which was denied and he has appealed both from the order of denial and from judgment.

The grounds urged as a basis for a new trial were:

1. That the evidence is insufficient to sustain the verdict and judgment.

2. Errors of law occurring upon the trial of the case.

3. Irregularity in the proceedings by counsel for the adverse party.

4. Newly discovered evidence.

We shall first direct our attention to the specification that the evidence is insufficient. The collision occurred on Highway 10 just at the outskirts of the City of Medina. Leaving Medina for the east, Highway 10 proceeds eastward along the main street of the city. At the eastern edge of the city it curves to the right and after proceeding in a southerly direction for about a quarter of a mile it curves to the left and continues in an easterly direction. At the southern end of the curve to the east, the highway is intersected by a gravel road known as the School House Road. This road enters the highway from the west in a straight line with the course of Highway 10 to the east. The collision took place in the arc of the curve immediately north and west of the intersection of Highway 10 and the School House Road.

According to plaintiff's testimony, he left Medina on Highway 10, intending to drive to Jamestown. He proceeded east to the edge of the city, negotiated the first curve to the south and was about to enter the curve to the east when he saw the car driven by Reinhold Suko, traveling at a speed of 55 to 60 miles an hour, about to enter the curve from the east. When the Suko car was about 200 feet away he noticed that it was astride the yellow line on the highway which separates the lanes for eastbound and westbound traffic. As the cars approached each other the Suko car encroached further and further into plaintiff's driving lane. At some point before the collision, plaintiff's recollection failed and he did not testify as to the extent of the maximum encroachment of the Suko car into his traffic lane. He did not testify as to any steps taken by him to avoid the collision. George Fisher who was a passenger in the Knoepfle car testified that he first saw the Suko car when it was about 100 feet distant. At that time the Suko car was in the middle of the road. He testified: "the yellow line was right in the middle of his car as he was coming towards us * * * it just came right on and hit us head on." Mr. Fisher did not testify as to any action on the part of Knoepfle to avoid the collision. Mr. Suko was killed in the collision and there were no other eye witnesses to the accident. At the place where the collision occurred the paved portion of the highway was 28 feet wide with a graveled shoulder seven feet wide. The yellow line dividing the traffic lanes on the highway had faded but was still distinct enough to be seen. At its maximum it was 11.9 feet in from the outside edge of the westbound lane of the pavement and at places was as close as 11 feet to that edge. The eastbound lane of the pavement was from 16 to 17 feet in width.

After the collision the Suko car came to rest in the westbound traffic lane, with its right front wheel 5 ft. 2 in. from the north edge of the paving and its right rear wheel 5 ft. 10 in. from that edge. The Knoepfle car was standing in the eastbound lane, headed north, perpendicularly to the line of traffic. Its right front wheel was 3 ft. 6 in. southwest of the left front wheel of the Suko car. There was a gouge in the pavement, opposite the rear of the Suko car and 3 ft. 8 in south of the yellow line. From this gouge to the left front of the Suko car

were lighter broken lines scratched in the pavement. The left front of the Suko car was resting upon a broken spring mechanism or the frame of the car. There was also testimony that there were some tracks on the north lane of the pavement leading to the left rear wheel of the Suko car.

Upon this evidence it is appellant's contention, first: that the physical facts demonstrate conclusively that plaintiff's testimony that the collision took place in the eastbound lane cannot be true and that therefore there is no adequate proof of negligence on the part of Reinhold Suko, and second: that if the evidence permits an inference of negligence on the part of Reinhold Suko, it also compels a conclusion of contributory negligence on the part of the plaintiff.

■ Questions of negligence and contributory negligence are questions for the jury. It is only where the evidence is such that reasonable men can reach but one conclusion therefrom that they become questions of law for the court. Satterland v. Fieber, N.D., 91 N.W.2d 623; Goulet v. O'Keeffe, N.D., 83 N.W.2d 889; Schweitzer v. Anderson, N.D., 83 N.W.2d 416; Austinson v. Kilpatrick, N.D., 105 N.W.2d 258.

Appellant advances several arguments to support his position. He says that the location of debris between the two cars and mud under the Suko car indicates that the cars stopped at the point of impact. He says that the track in the north lane of the highway leading to left rear wheel of the Suko car and the absence of skid marks to indicate a spinning motion of the Knoepfle car demonstrate that the collision could not have happened in the south lane of the highway. He also says that the fact that the damage to the Knoepfle car extended almost across the entire front end while that to the Suko car was confined to the left front end shows that the cars must have collided at an angle and not head on.

■ The respondent answers that the gouge mark in the pavement and the scratches leading to the left front of the Suko car and the location of some debris to the east of two cars indicate that the gouge mark shows the point of impact. He suggests that Suko might have discovered that he was in the wrong lane and had headed back to his proper lane just before the collision. This theory is supported by the fact that the glass from the windshield of the Suko car was to the northwest of the car and not directly in front of it. It also explains the asymetrical damage to the cars. In view of the conflicting inferences which this evidence appears to allow and the lack of certainty as to the responsibility of the cars involved in this collision for all the marks on the pavement, we cannot say that they establish any facts with sufficient certainty to invalidate the jury's finding as to the credibility of Knoepfle and his witness, Fisher. It is for the jury and not the appellate court to determine the credibility of witnesses. Dahl v. North American Creameries, N.D., 61 N.W.2d 916; Thompson v. Hannah Farmers Co-op. Elevator Co., N.D., 79 N.W.2d 31; Stokes v. Dailey, N.D., 85 N.W.2d 745.

■■ Upon his contention that the evidence establishes contributory negligence as a matter of law, appellant urges that plaintiff's failure to testify that he took any steps to avoid the collision coupled with the fact that, even if Suko had encroached on the eastbound lane to the maximum distance inferable from the evidence, there still remained 12 to 13 feet width of pavement and seven feet of shoulder unobstructed and open to travel, necessitates a conclusion of contributory negligence. He says, that plaintiff had an easy way to avoid the collision and in the exercise of ordinary care would have done so. According to plaintiff's testimony the two cars were approaching each other at a combined speed of about 90 miles an hour, or at the rate of 122 ft. a second. Since plaintiff did not notice that the Suko car had crossed the yellow line until it was about 200 feet distant, he would have had only about a second and a half to take action to avoid

the collision. Whether the exercise of ordinary care would have required such action is in our opinion a question for the jury. We are satisfied therefore that the evidence in the case is sufficient to sustain the verdict.

The first classification of errors of law specified relates to the admission of testimony. Foremost among these is the specification that it was error for the court to permit the plaintiff to give any testimony concerning his own actions or the actions of Reinhold Suko after he first observed the Suko car. It is contended that plaintiff was incompetent to testify to such facts under the provisions of Section 31–01–03, NDCC (Sec. 31–0103, NDRC 1943) This section provides:

> "In any civil action or proceeding by or against executors, administrators, heirs at law, or next of kin in which judgment may be rendered or ordered entered for or against them, neither party, except as provided in section 31–01–04 and section 31–01–05, shall be allowed to testify against the other as to any transaction whatever with or statement by the testator or intestate, unless called to testify thereto by the opposite party. Where a corporation is a party to any proceeding mentioned in this section, no agent, stockholder, officer, or manager of such corporation, shall be permitted to testify to any transaction or conversation had with the testator or intestate."

This section is an anachronism which persists from the days when all parties interested in litigation were disqualified as witnesses. This general disqualification by interest was abolished in the several jurisdictions in the United States at various times during the 19th Century but "an exception was carved out of the old disqualification and was allowed to perpetuate within a limited scope the principle of the discarded rule. The scope of this modern rule excludes the testimony of the survivor of a transaction with a decedent, when offered against the latter's estate." Wigmore on Evidence 3rd ed., sec. 578, p. 695. The abolition of the disqualification and the exception thereto first appear in this jurisdiction in the Laws of Dakota of 1868. In their present form they first appear in the 1877 Code of Dakota Territory. The original exclusion was based upon the premise that persons having a pecuniary interest in litigation are likely to speak falsely and therefore they should be totally excluded as witnesses. When the general disqualification was abolished, the exception was created on the premise that witnesses with an interest who could not be contradicted by another party to a transaction would be more likely to testify falsely than interested parties who could be contradicted. Early in its history this court expressed its opinion as to the efficacy of this exception to accomplish its intended purpose. Judge Corliss, speaking for the court in St. John v. Lofland, 5 N.D. 140, 143, 144, 64 N.W. 930, 931 said:

> "Statutes which exclude testimony on this ground are of doubtful expediency. There are more honest claims defeated by them by destroying the evidence to prove such claim than there would be fictitious claims established if all such enactments were swept away, and all persons rendered competent witnesses. To assume that in that event many false claims would be established by perjury is to place an extremely low estimate on human nature, and a very high estimate upon human ingenuity and adroitness. He who possesses no evidence to save his case save that which such a statute declares incompetent is remediless. But those against whom a dishonest demand is made are not left utterly unprotected because death has sealed the lips of the only person who can contradict the survivor, who supports his claim with his oath. In the legal armory, there is a weapon whose repeated thrusts he will find it difficult, and in many cases impossible, to parry

if his testimony is a tissue of falsehoods,—the sword of cross-examination. For these reasons, which lie on the very surface of this question of policy, we regard it as a sound rule to be applied in the construction of statutes of the character of the one whose interpretation is here involved, that they should not be extended beyond their letter, when the effect of such extension will be to add to the list of those whom the act renders incompetent as witnesses."

■■ This forceful language has been quoted or cited with approval in many subsequent decisions of this court. Omlie v. O'Toole et al., 16 N.D. 126, 112 N.W. 677; Luick v. Arends, 21 N.D. 614, 132 N.W. 353; Mowry v. Gold Stabeck Co., 48 N.D. 764, 186 N.W. 865; Keller v. Reichert, 49 N.D. 74, 189 N.W. 690; Barlow Grain & Stock Exchange v. Nilson, 57 N.D. 624, 223 N.W. 700; Miller v. First Nat. Bank of Linton, 62 N.D. 122, 242 N.W. 124; International Shoe Co. v. Hawkinson, 72 N.D. 622, 10 N.W.2d 590; McDonald v. Miller, 73 N.D. 474, 16 N.W.2d 270, 156 A.L.R. 1328. This policy of strict construction long applied by this court to the statute in question is in accord with the general rule that exceptions to statutes of general application must be construed strictly and that where a general rule is established by a statute with exceptions, the court will not curtail the former or add to the latter by implication. 82 C.J.S. Statutes § 382 c, pp. 891, 893.

Since this is a suit against the estate of a deceased person the precise question for decision is: Does the testimony of the plaintiff as to the speed of his car and that of the decedent's car and as to their respective positions with regard to the dividing line of the highway, immediately before the collision, constitute testimony as to a transaction with the decedent? The word transaction is defined by Webster's International Dictionary 2nd ed. as follows: "1. The act or process of transaction, or an instance of such; as, averse

to the *transaction* of business at this time. 2. That which is transacted or in the process of being transacted. Specif: a. A Business deal; an act involving buying and selling; as, the *transactions* on the exchange. b. pl. The records, esp. the published records, of action taken, addresses read etc. at the meeting or meetings of a society or association; proceedings. 3 Philos. An action or activity involving two parties or two things mutually affecting or reciprocally influencing one another." The verb transact is defined as follows: "Intransitive 1. To prosecute negotiations; to carry on business; to have dealings; as, unwilling to transact with the enemy. 2. To make a transaction, to compromise, esp. by compliance or concession in a matter of principle. Transitive: 1. To carry through, to bring about; perform; more narrowly, to carry on, or conduct, as business; as, he transacted the negotiations efficiently. 2. Now Rare, a. To pass back and forth as in negotiations or trade; to bargain or dicker about. b. To transfer; to turn over, as for settlement. 3. To bring into actuality or existence."

■ A consideration of the foregoing definitions leads us to the conclusion that a transaction is the end result of transacting and that two persons accomplish a transaction with each other by transacting with each other. The act of transacting necessarily implies reciprocal actions or statements on the part of the parties engaged in the act. We hold therefore that when two strangers each driving his own automobile, each acting independently of the other, unwillingly and fortuitously come in contact with each other upon a public highway, that the incident does not constitute a transaction between the parties and that the testimony of a survivor of such a collision as to his independent observations of the relative speed and the positions of the cars before the collision does not constitute testimony as to a transaction with the other person involved in the collision. Any other construction would do violence to the long established rule that this court

will construe the so called "dead man's statute" strictly and not give to any of its words a meaning which, to any extent, extends their literal and ordinary connotations. We are aware that many courts have construed the word transaction to include pure accidents. It is a general rule that the only incidents of a transaction, which come under the ban, are those which are known to both parties to the transaction. It seems to us that some courts have fallen into the error of concluding, on the basis of this rule, that every incident involving two parties, the details of which are known to both, is a transaction within the bar of the statute. The fallacy inherent in such a conclusion is obvious. It may be illustrated by the absurdity; the class, white cats, includes only cats, therefore all cats are white cats. Cases which support our conclusion and which we think expound the better rule are: Shaneybrook v. Blizzard, 209 Md. 304, 121 A.2d 218; Krantz v. Krantz, 211 Wis. 249, 248 N.W. 155; McCarthy v. Woolston, 210 App.Div. 152, 205 N.Y.S. 507; Rankin v. Morgan, 193 Ark. 751, 102 S.W.2d 552; In re Estate of Talty, 232 Iowa 280, 5 N.W.2d 584, 144 A.L.R. 859; Krause v. Emmons, 6 Boyce 104, 29 Del. 104, 97 A. 238; Gibson v. McDonald, 265 Ala. 426, 91 So.2d 679.

At the close of the plaintiff's examination in chief, the attorney for the defendant referring to his objection to plaintiff's testimony on this ground made the following statement to the court.

"At this time, your honor, without waiving my objections to this line of testimony, I am forced now to cross-examine on it, but I am willing to have all of the testimony including the cross-examination stricken if the court should decide the whole thing is improper."

To this statement counsel for plaintiff responded.

"If the court please, if counsel goes into this matter under cross-examination, we want the record to show that he has waived any objection he may have to the evidence as previously made."

There followed considerable discussion between counsel and the court which was ended by the court's ruling:

"* * * it appearing to the court that any reference that would apply to the dead man's statute should not be raised by cross-examination or redirect examination. The court will so hold."

This ruling was construed by the attorneys for both sides and by the court to mean that the attorney for the defendant could not cross-examine the plaintiff with respect to any of his testimony which defendant contended was barred by the "dead man's" statute, and that the attorney for the plaintiff could not refer to such subjects again upon redirect examination. This ruling is specified as error.

■■■ It was clearly error for the court to require a party to waive an objection to testimony as a condition precedent to cross-examination with respect to that testimony or in the absence of such express waiver to prohibit such cross-examination. Where a party objects to the admission of testimony and the testimony is admitted over his objection such party does not waive the objection by cross-examining the witness with respect to such testimony. Bonogofsky v. Kraft, N.D., 92 N.W.2d 179. The effect of the ruling was to deny defendant the right to cross-examine plaintiff concerning the testimony upon which his cause of action was founded. The right to cross-examine is absolute. 98 C.J.S. Witnesses § 368, p. 114. Its denial here with respect to material evidence is prejudicial error which will require a new trial of this case. Error is also specified upon the admission of the testimony of the plaintiff and the witness Fisher as to the speed of the Suko car. This testimony was objected to on the ground that no proper foundation had been laid. With respect to the plaintiff, the foundation was as follows:

"Q. How long have you driven an automobile Mr. Knoepfle? A. Since I was 17 years old.

"Q. Have you driven a car every year during that period? A. Yes.

"Q. When did you own your first automobile? A. When I was 17 years old.

"Q. As you drive your automobile do you have occasion to notice the relative speed of your car and other cars as you drive? A. Pretty close. Yes.

"Q. Do you have an opinion as to the speed of the Suko car as you saw it there? A. Yes."

The foundation laid for Fisher's testimony was substantially the same, except for the fact that Knoepfle stated that he first saw the Suko car when it was 300 feet distant while Fisher did not notice it until it had approached to within 100 feet. Knoepfle testified that the Suko car was approaching at a rate of 55 to 60 miles an hour while Fisher estimated its speed at 50 miles an hour.

 The general rule as stated in Blashfield Cyc. of Automobile Law and Practice, Perm. ed., Section 6232 is:

"A person who is of ordinary intelligence, who has some knowledge of the speed generally of the class of vehicles to which the one involved in an accident belongs, and who actually witnessed the speed of the vehicle in question at or near the time of the accident in which it was involved, * * * is a competent witness on the issue of a speed. * * *"

See also Jones, Commentaries on Evidence (2nd ed.) 2323. Defendant's specific objection to the foundation for this testimony is that, upon their own admissions, the witnesses did not have a sufficient opportunity to observe the speed of the Suko car. Fisher had an opportunity to observe the Suko car from the time it was 100 feet

away until the time of the collision while Knoepfle had it in view from the time it was 300 feet away until the collision. These are substantial distances and although the elapsed time between the time the witnesses first saw the Suko car and the time of the collision is concededly very short, this shortness of time is one of the necessary factors in forming an opinion as to speed. We are satisfied that where there is some substantial opportunity for observation, that the degree of opportunity and the extent of observation is not a matter which affects the competency of the witness, but one which goes only to the weight to be given to the testimony. Lewis v. Miller, 119 Neb. 765, 230 N.W. 769, 70 A.L.R. 532; Patterson v. Kerr, 127 Neb. 73, 254 N.W. 704; Ford v. Southwestern Greyhound Lines, 5 Cir., 180 F.2d 934; Dean v. Feld, 77 Cal.App.2d 327, 175 P.2d 278; Thornbury v. Maley, 242 Iowa 70, 45 N.W.2d 576; Miracle v. Flannery's Adm'r, Ky., 259 S.W. 2d 689; Marcucci v. Bird, 275 App.Div. 127, 88 N.Y.S.2d 333; Tyndall v. Harvey C. Hines Co., 226 N.C. 620, 39 S.E.2d 828; Mills v. Banks, 97 Ohio App. 557, 127 N.E. 2d 773; Shaffer v. Torrens, 359 Pa. 187, 58 A.2d 439. The admission of this evidence was therefore proper.

Error was also specified upon the refusal of the trial judge to permit proof of the plaintiff's driving record. Upon cross-examination the plaintiff admitted that his driver's license had been suspended, and stated that he was driving with a permit which he did not have with him at the time because he had been robbed in Montana. He admitted that he had pleaded guilty to driving without a license shortly after this accident. He was then asked:

"Q. Now, as a matter of fact, the reason you didn't have a driver's license is that your driver's license had been revoked and had tried to get a driver's license and you failed in the test, isn't that right?"

An objection to this question was sustained and the defendant made the following offer of proof:

"At this time defendant offers to prove on cross-examination of the plaintiff that plaintiff was convicted of the following offenses between 1953 and 1956. On June 16, 1953, reckless driving; December 13, 1953, drunken driving; December 14, 1954, drunken driving, August 15, 1955, drunken driving; September 9, 1955, drunken driving; that his driver's license was revoked and that on March 20, 1956, he took driver's examination for the purpose of getting a driver's license and that he failed to pass the examination."

According to the defendant's attorney the purpose of the offer was to show that plaintiff was not a qualified driver. An objection to the offer was sustained and this ruling is specified as error.

■■■ This offer of proof was properly overruled. At the most it would tend to prove general incompetence only. Evidence of general competency or incompetency is not admissible upon the issue of negligence. Blashfield Cyc. of Automobile Law & Practice (Perm. ed.) Sec. 6187. Chicago, I. & L. R. Co. v. Prohl, 64 Ind.App. 302, 115 N.E. 962; Fonda v. St. Paul City R. Co., 71 Minn. 438, 74 N.W. 166; Parkinson v. Syracuse Transit Corp., 279 App.Div. 848, 109 N.Y.S.2d 777; Hoke v. Atlantic Greyhound Corp., 227 N.C. 412, 42 S.E.2d 593; Elliott v. A. J. Smith Contracting Co., 358 Mich. 398, 100 N.W.2d 257; Geier v. Tjaden, N.D., 74 N.W.2d 361.

Certain of the trial judges instructions were also specified as error. The first of these is the charge concerning the laned highway. This instruction is as follows:

"Driving on roadways laned for traffic. Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply: A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

This instruction is a direct quotation of Section 39–10–17 subsection 1, NDCC. There is no question but that it is a correct statement of the law. Defendant says, however, that it was not applicable to the evidence in the case and therefore improper.

A highway patrolman testified, that beginning at a point ten feet east of the rear end of the Suko car, there were two broken yellow lines on the highway, one was 11 feet from the north edge of the blacktop and the other was 11 ft. 9 in. from the north edge, he did not say how far to the east they extended. The lines were worn and faded "but they were visible if you looked for them." They were completely obscured in some places and in other places they were hard to see. On the other hand Knoepfle testified that he could see the Suko car astride the yellow line when it was two hundred feet away and Fisher said he could see it astride the line when it was a hundred feet away.

■■■ In view of the fact that the collision took place on a curve, and that the yellow lines (such as they were) did not extend beyond the curve to the west, we are of the opinion that this testimony raised an issue of credibility between the testimony of the patrolman and that of Knoepfle and Fisher. If the patrolman's testimony is true the highway was not clearly marked. If Knoepfle's and Fisher's statements are true, it was clearly marked. This was an important issue in the case because the yellow lines were not in the center of the paved portion of the highway. If the highway was not clearly laned, Suko was entitled to half the highway, and the degree to which he encroached upon the lane reserved for opposing traffic, even under plaintiff's theory of the case, would be minimized almost, if not completely, to the vanishing point. In these circumstances the instruction complained of should not have been given without cautioning the jury, that before they could apply it, they

would have to find as a fact from the evidence in the case that the roadway was divided into clearly marked lanes. Without such caution the jury might well have assumed that, in the trial judge's view of the evidence, the roadway was clearly marked. See Carlson v. Hoff, 59 N.D. 393, 230 N.W. 294.

As grounds for a new trial, defendant also urged alleged misconduct of counsel for the plaintiff and newly discovered evidence. Since a new trial must be granted because of the errors in the trial of the case heretofore considered, and there is no reasonable probability of any of the issues raised by these specifications, arising upon such new trial, they will not be considered.

The judgment is reversed and a new trial granted.

SATHRE, C. J., and MORRIS, STRUTZ and TEIGEN, JJ., concur.