# STATE OF MICHIGAN

# COURT OF APPEALS

---

CASSANDRA HARRIS and DORAHETTA
PEERY,

        Plaintiffs-Appellants/Cross-
        Appellees,

v

GENESEE COUNTY, GENESEE COUNTY
COMMUNITY ACTION RESOURCE
DEPARTMENT, and STEVE WALKER,

        Defendants-Appellees/Cross-
        Appellants.

UNPUBLISHED
January 17, 2017

No. 328650
Genesee Circuit Court
LC No. 2013-101728-CZ

---

Before: TALBOT, P.J., and JANSEN and HOEKSTRA, JJ.

PER CURIAM.

This case involves claims under the Whistleblower's Protection Act (WPA), MCL 15.631 *et seq.* and the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.* Following a jury trial, plaintiffs Cassandra Harris and Dorahetta Peery appeal as of right an order of no cause of action entered in favor of defendants Genesee County ("the County"), Genesee County Community Action Resource Department ("G-Card"), and Steve Walker. Because plaintiffs are not entitled to a new trial based on defense counsel's conduct at trial and plaintiffs were not entitled to judgment notwithstanding the verdict (JNOV), we affirm.

## I. FACTS

G-Card is a department of the County involved with administering various social services to the community, including programs such as Meals-on-Wheels, Head Start programs for children, Work First, and the weatherization of homes. G-Card operates almost entirely on grant funding. In the fall of 2013, Walker was the executive director of G-Card. Harris worked as Walker's executive secretary, and Peery was an assessment counselor in the Work First program.

Given that G-Card is a grant funded organization, the parties agree that funding-related layoffs are always a possibility. Relevant to the present case, in the fall of 2013, there were two rounds of layoffs at G-Card that ultimately resulted in plaintiffs losing their positions at G-Card. First, in August or September of 2013, G-Card lost its PATH grant funding and, as a result, all PATH-related programs, including Work First, were eliminated in September. Seven people lost

-1-

their jobs at that time. Peery's specific position in Work First was eliminated, but due to her seniority she was able to "bump" another G-Card employee and she became a technical assistant in the Food Services Program. Harris was unaffected by the September layoffs.

A second round of layoffs occurred in November of 2013, and the legitimacy of this second round of layoffs was central to the parties' dispute in the trial court. During this second round of layoffs, six people lost their jobs. Peery lost her technical assistant job. Harris was also among the six people scheduled to be laid off, but she opted to resign instead. The distinction is that, as a result of resigning, Harris did not have "recall" rights to be rehired. Later, in November of 2014, Peery was called back to G-Card. Peery then again lost her job in 2015, at which time she refused an offer from G-Card to move to a part-time position.

After losing their jobs, plaintiffs brought the present lawsuit, alleging violation of the WPA as well as several claims involving violations of ELCRA. More specifically, at trial, plaintiffs maintained that Walker had been improperly paying funds to a friend—Russell Carlson—without a contract for Carlson and his company, Al-Car Unlimited, to provide services to the County. Harris purportedly reported this activity to the FBI and others in July of 2013. Then, on September 30 and October 1, she filed a complaint against Walker with the human resources (HR) department and the chair of the County Board of Commissioners ("the Board"), alleging that Walker threatened her. During an independent investigation that followed by attorney Laura Amtsbuechler, Harris also raised allegations of sexual harassment by Walker. Peery participated in Amtsbuechler's investigation. Ultimately, Amtsbuechler determined that Harris's allegations of harassment were unsubstantiated.

According to plaintiffs' theory of the case, when their jobs were eliminated in November of 2013, there was grant funding for their positions at G-Card. Plaintiffs focused their financial analysis almost exclusively on the Community Service Block Grant ("S-Grant"). Plaintiffs claimed that administrative positions were funded solely by the S-Grant and that the S-Grant increased for the 2014 fiscal year as compared to 2013. Thus, according to plaintiffs, there was available funding and Walker fabricated the need for the November layoffs as a pretext to retaliate against them.

In terms of their discrimination and hostile workplace claims, broadly speaking, plaintiffs contended that Walker targeted African-American women in the workplace for sexual discussions and that he made racially inappropriate comments. For example, his purported sexual misconduct involved discussing details of his personal life at work, including sharing information about his wife and ex-wives. There were also allegations that he discussed the frequency with which attractive African-American women are subjected to sexual abuse as well as his theories on the effect such abuse has on a woman's ability to experience an orgasm and his own ability to bring a woman to orgasm. It was also claimed that, on one occasion, he used the term "sugar daddy" in a conversation with Harris. In terms of racial misconduct, plaintiffs' central claim was that Walker used words such as "ghetto" and "street" as insults in reference to Peery and Harris as well as other African-American individuals at G-Card.

In contrast to plaintiffs' version of events, defendants denied any wrongdoing. The basic defense theory of the case was that the 13 layoffs at G-Card in the fall of 2013—including the loss of Peery's and Harris's positions—were necessitated by budgetary constraints and a loss of

funding, which prompted a reorganization of G-Card. Specifically, defendants note that the September layoffs were undisputedly a direct result of the loss of approximately $647,000 in PATH funding. More generally, defendants maintain that G-Card had a more than $500,000 deficit at the end of 2013 and that, compared to 2013, G-Card saw cuts "across the board . . . in a lot of programs," resulting in an overall budget reduction of approximately $11 million for the 2014 fiscal year, which prompted widespread changes in G-Card, including the additional November layoffs.

Defendants emphasized that, in contrast to plaintiffs' single-minded focus on the S-Grant, G-Card receives close to 30 grants and almost all the grants contribute a portion to funding administrative positions, meaning that the S-Grant is not the only relevant consideration and the administrative budget was affected by cuts in other grants. Indeed, the S-Grant represented only a little over $1 million of close to a $20 million overall G-Card budget and the S-Grant contributed only $130,000 to the more than $1 million administrative budget. Moreover, looking specifically at the S-Grant, defendants asserted that, due to the federal budget issues in the fall of 2013, at the time decisions for the 2014 fiscal year were being made, there was great uncertainty with respect to the prospective S-Grant funding for 2014.[1] Between cuts in other grants and the uncertainty in S-Grant funding, defendants maintain that there were legitimate budgetary concerns which required restructuring of G-Card.

Notably, defendants also offered evidence that the changes at G-Card—including the elimination of Harris's and Peery's positions—were in the works *before* Walker or anyone else at the County knew of Harris's complaints or Amtsbuechler's investigation. In particular, several witnesses testified that Walker and program directors met on September 30 and October 1 to discuss possible solutions to the budget crisis, including the elimination of positions. At the meeting on September 30, Matthew Purcell, a program director at G-Card, proposed a plan for eliminating several positions, including the executive secretary job and a technical assistant job. Defense witnesses described these discussions as "very painful" insofar as the proposed eliminations would require "brutal" cuts in staff.

---

[1] For example, on September 27, 2013, G-Card received notice that S-Grant funding would not be affected, "unless a long government shutdown" occurs, obviously meaning that *if* a long government shutdown occurred S-Grand's funding would be affected. The record also shows that, on October 2 of 2013, G-Card received a "notice of funds" for the 2014 fiscal year for half of the S-Card funding it received the previous year. Plaintiffs' witness, Viran Parag, defined a "notice of funds" as "authorizing funding for that specific dollar amount and no more than that." Because there was no federal budget at that time, the funds awarded for 2014 were in fact unspent monies given to Michigan in 2013, which the State chose to distribute for the coming year. More generally, Parag confirmed that that there was uncertainty in the fall of 2013 and that the 2014 fiscal year was not a "typical" year because of the federal sequestration. It was ultimately not until sometime in 2014 that the full amount of the S-Grant for that year was known. Overall, according to defendants' evidence, they were faced with uncertain S-Grant funding for the coming 2014 fiscal year that required prudent decision-making.

On the evening of September 30, Walker told Harris about the "deep cuts" that were coming. In defendants' view, Harris in fact fabricated her complaints to HR against Walker on September 30 because Harris knew of the impending changes at G-Card and she was trying to insulate herself from being let go. Harris did not notify the County of her FBI report until October 7, 2013, and Walker and the other directors did not learn of Harris's complaint to HR until late in the day on October 1, after they had already engaged in almost two days of discussions on the elimination of positions.

Overall, Walker and others adamantly denied that Peery's and Harris's reporting activities about Walker had any impact on the G-Card reorganization and the November layoffs. Indeed, it was Purcell, not Walker, who proposed the elimination of these positions. Moreover, defendants' evidence showed that Walker in fact lacked the power to unilaterally lay-off employees because layoffs had to be approved by the Board and, once Board approval was obtained, the matter then went to HR, which determined, based on employee seniority, how the layoffs would affect individual employees. Ultimately, 13 people lost their jobs in the fall of 2013, G-Card had not returned to its former staffing levels at the time of trial, and G-Card was still in the process of trying to "underspend" to combat a budget deficit.

With respect to the allegations of racial and sexual misconduct by Walker, Walker denied any misconduct. He largely denied making the various comments in question and, those comments that he did acknowledge to some degree, he explained as having been misquoted and taken out of context.

After a fact-intensive, vigorously litigated 14-day trial, the jury returned a verdict in favor of defendants on all claims. The jury found that both plaintiffs had engaged in protected activity for purposes of their WPA claims, but the jury concluded that this protected activity did not result in adverse employment action against plaintiffs. The jury also rejected plaintiffs' various claims under ELCRA. As a result, the trial court entered a judgment of no cause of action as to all counts in favor of defendants. The trial court later denied a motion by plaintiffs for a new trial and/or JNOV.

Plaintiffs now appeal as of right. Defendants have filed a cross-appeal, raising issues that need only be decided if plaintiffs prevail on appeal.

## II. DEFENSE COUNSEL'S CONDUCT

On appeal, plaintiffs argue that they are entitled to a new trial in view of defense counsel's purported misconduct during trial. They challenge a variety of defense counsel's remarks on several different grounds, asserting that, individually or collectively, defense counsel's remarks warrant reversal. In making their arguments, plaintiffs' have taken defense counsel's remarks out of context, distorted the record, and conveniently ignored their own conduct at trial which contributed to any alleged error at trial. Considering the challenged remarks in context, there was no impropriety or, even assuming some impropriety, the remarks did not affect the outcome of the trial. Thus, plaintiffs are not entitled to a new trial.

Generally speaking, "[t]he art of advocacy is the art of persuasion" and "[i]t is counsel's duty to use all legitimate means to convince the jury or the court that a finding for his client will

be in accord with justice." *Elliott v AJ Smith Contracting Co*, 358 Mich 398, 418; 100 NW2d 257 (1960). However, "[w]hile a lawyer is expected to advocate his client's cause vigorously, parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 292; 602 NW2d 854 (1999) (citation and quotation marks omitted). "A lawyer's comments will usually not be cause for reversal unless they indicate a deliberate course of conduct aimed at preventing a fair and impartial trial or where counsel's remarks were such as to deflect the jury's attention from the issues involved and had a controlling influence on the verdict." *Ellsworth v Hotel Corp of Am*, 236 Mich App 185, 191-192; 600 NW2d 129 (1999). More specifically, our Supreme Court has explained our review of counsel's conduct as follows:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. [*Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 501; 668 NW2d 402 (2003), quoting *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 102-103; 330 NW2d 638 (1982).]

## A. ABILITY TO PAY

Plaintiffs first contend that defense counsel improperly appealed to the jury's sympathies and their status as taxpayers by suggesting that defendants lacked the ability to pay a judgment. Specifically, plaintiffs challenge defense counsel's statement during closing arguments that: "They don't have enough money to pay the bills; and they want you say pay them and cut somewhere else. That's really what they're saying."

Commentary on defendants' ability to pay a judgment would generally be improper. See *Reetz*, 416 Mich at 111 & n 29; *Herman v Ploszczanski*, 369 Mich 252, 257-258; 119 NW2d 541 (1963). And, it would be improper, in the context of discussing payment of a judgment by a governmental entity, to appeal to the jurors' interests as taxpayers. See *Bd of Co Rd Com'rs of Wayne Co v GLS LeasCo, Inc*, 394 Mich 126, 135; 229 NW2d 797 (1975). However, counsel's conduct and arguments must be considered in context, in light of the evidence at trial and opposing counsel's conduct and arguments. See *Herman*, 369 Mich at 258-260; *Fisher v Hatcher*, 44 Mich App 541, 547; 205 NW2d 913 (1973).

In this case, when defense counsel's remarks are read in context it is eminently plain that defense counsel was not discussing defendants' ability to pay a judgment nor was defense counsel suggesting that the jury should favor defendants due to the jurors' interests as taxpayers. Rather, consistent with the evidence, defense counsel argued that ongoing financial straits at G-Card prompted plaintiffs' layoffs. More fully, defense counsel stated:

Money eventually came in from [the S-Grant], but only about $100,000 from this grant is used for that 1.4 million of administrative costs. The rest of it comes from other grants; and the way to think of it is it's like a pie. . . . So every single grant is divided between program money and salary. And the – the evidence is uncontroverted, it's unrebutted that G-Card lost several million dollars in grant money in other grants; that they were $400,000 short; and that, as of today, they're still running a deficit. They had thirty-three employees; and now they have twenty-one. Nobody has contradicted that. *They don't have enough money to pay the bills; and they want you to say pay them and cut somewhere else. That's really what they're saying.*

Look, I'm sorry that they lost their jobs. I'm sorry that the other eleven people lost their jobs. . . . This is something that was an agonizing decision for the people involved. They cut people back so severely that they were losing people with seventeen years seniority. [Emphasis added.]

Given that plaintiffs claimed G-Card had money to continue plaintiffs' employment and that the defense at trial centered on the assertion that plaintiffs were laid off for financial reasons, there was nothing improper about defense counsel presenting the defense's financial arguments to the jury. Plaintiffs' argument is wholly without merit.[2]

B. APPEALS TO RACIAL PREJUDICES

Plaintiffs next assert that defense counsel made blatant appeals to racial prejudices and bated the jury with inflammatory statements designed to have the jury base its decision on improper racial considerations rather than the evidence. Efforts to gratuitously insert issues of race or to appeal to racial prejudices would certainly be improper. See *Powell v St John Hosp*, 241 Mich App 64, 79; 614 NW2d 666 (2000); *Smith v E R Squibb & Sons, Inc*, 69 Mich App 375, 385 n 7; 245 NW2d 52 (1976). But, we see no such conduct by defense counsel in this case.

---

[2] Relatedly, plaintiffs assert that defense counsel perpetrated a "fraud" on the jury by arguing that defendants lacked the ability to pay when in fact defendants have insurance. Plaintiffs maintain that this "fraud" was compounded because defense counsel asked that the trial court not read M Civ JI 3.06, which would have instructed the jury that "[w]hether a party is insured has no bearing whatever on any issue that you must decide." This allegation of "fraud" is baseless. As discussed, defense counsel did not argue that defendants lacked the ability to pay. Further, there was no dispute regarding insurance during trial and thus it was entirely proper for defense counsel to ask for the omission of this instruction. See M Civ JI 3.06, Use Notes. Indeed, at trial, plaintiffs agreed that the trial court could "take out" M Civ JI 3.06 and, having agreed to this course of conduct, plaintiffs waived any claim of error relating to the omission of this instruction. See *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 546; 854 NW2d 152 (2014). In short, there is absolutely no merit to plaintiffs' claim of "fraud."

First, plaintiffs state on appeal that, during jury voir dire, defense counsel "accused" plaintiffs of playing the "race card" and cast plaintiffs in the same light as "infamous people like the Reverend Al Sharpton who is generally despised by the white community for his allegedly and repeatedly playing the 'race card.' " This is a misstatement of the record insofar as defense counsel did not "accuse" plaintiffs of playing a "race card;" rather, defense counsel asked the prospective jurors whether they were generally familiar with the term "race card" and "what the term race card means to [them]?" Defense counsel then asked, "So you're familiar with the concept, the idea that some people use race as an excuse for other problems, fair enough?" Defense counsel made no other references to the term "race card" at trial. And, defense counsel certainly made no comparisons between plaintiffs and Al Sharpton.

In contrast, plaintiffs made repeated use of the term "race card" at trial, during jury voir dire, during opening statements, during the questioning of several witnesses, and during closing arguments. Indeed, it was plaintiffs' attorney who made references to Al Sharpton being a "race card player." And, plaintiffs introduced testimony, via Harris's testimony, that "the race card was for racists."

Given that plaintiffs failed to object to defense counsel's use of the term "race card" and plaintiffs then repeatedly used the term "race card" before the jury, they cannot claim error on appeal based on mention of the phrase "race card" at trial.[3] See *Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014); *Genna v Jackson*, 286 Mich App 413, 422; 781 NW2d 124 (2009). This is particularly true given that plaintiffs' claim of error rests heavily on some perceived comparison to Al Sharpton, but it was only plaintiffs who made any reference at all to Al Sharpton.

---

[3] Moreover, in the context of this case, we note briefly that we do not see anything in defense counsel's mention of a "race card" during jury voir dire which was designed to inflame the prejudices of the jury or to interject irrelevant issues. See *George v Travelers Indem Co*, 81 Mich App 106, 114; 265 NW2d 59 (1978); *Smith*, 69 Mich App at 385. The present case involves claims of race discrimination, meaning that race was relevant and that defense counsel's fleeting reference to a "race card" was not an attempt to gratuitously insert the issue of race into the trial. Cf. *Powell*, 241 Mich App at 79. See also *Carter v Braunstein*, 89 Mich App 119, 122; 279 NW2d 596 (1979). Instead, in context, it is clear that defense counsel asked the jury an isolated question about a "race card" in an effort to ascertain whether they were willing to consider the "possibility" that claims of race discrimination could be false. We do not think this was improper in a case in which the defense involved the assertion that plaintiffs were bringing false claims of race discrimination after having been laid off for financial reasons. Moreover, defense counsel took care to discuss the issue in a professional manner, acknowledging that race discrimination is a continuing problem in America, defining the term "race card" in a neutral manner without reference to a particular group, and ultimately saying nothing that could be interpreted as an appeal to bias or prejudice against any particular group. Cf. *Solomon v Stewart*, 184 Mich 506, 511; 151 NW 716 (1915); *Cluett v Rosenthal*, 100 Mich 193, 199; 58 NW 1009 (1894). See also *People v Bahoda*, 448 Mich 261, 271; 531 NW2d 659 (1995).

Second, plaintiffs contend that defense counsel deprived them of a fair trial by stating during opening arguments that "you can't just turn around and say, after you lose your job, it's cause I'm black." We disagree. This is a case involving claims of race discrimination, and in this context defense counsel merely advanced the assertion that plaintiffs' claims of race discrimination were false and that the true reason for the layoffs was G-Card's financial state. More fully, defense counsel stated:

> [T]here was no race discrimination and there was no retaliation. It was a fiscal decision which impacted a lot of people; and it's too bad that anybody lost their job. It's too bad and it's upsetting to lose one's job, but you can't just turn around and say, after you lose your job, it's 'cause I'm black.

There was no assertion that the jury should decide against plaintiffs because of their race and, indeed, defense counsel specified that bringing false claims of race discrimination after losing a job was offensive to "black people" as well as "white people." In short, there was no effort to gratuitously insert the issue of race or to divert the jury's attention from the facts. See *Ellsworth*, 236 Mich App at 191-192; *Powell*, 241 Mich App at 79-80. Plaintiffs are not entitled to relief on this basis.

Third, in an apparent misunderstanding of defense counsel's statements, plaintiffs incongruously allege that defense counsel tried to make the case about "blacks versus whites" when defense counsel stated during opening statements that:

> Now there's a Department of Equity and Diversity and, before that, it was called the Affirmative Action Department; and there's a Human Resource Department. And they're both run by strong black women. And there's a lawyer for Genesee County, a strong black woman, Ms. Celeste Bell. *The Plaintiffs, to convince you that what they're saying is true, are gonna have to make you believe that there was a conspiracy between every black person at Genesee County, all of the black women who work there, the lawyer, the H.R. Department, the Department of Diversity, everybody's putting this under the rug to protect a white man who is discriminating, according to them, and harassing women*, that's what you have to believe to accept, to swallow this theory. Four and-a-half years, no written complaint. [Emphasis added.]

Fairly read, in actuality, defense counsel maintained that this case was *not* about "blacks versus whites." That is, the thrust of this discussion by defense counsel was that numerous African-American women in positions of authority to receive complaints of harassment and to combat discrimination in the workplace were in fact supporting Walker and corroborating Walker's version of events to the extent that there was ample testimony about the lack of reports against Walker. In short, contrary to plaintiffs' argument, defense counsel did not suggest that this case was a matter of "blacks versus whites."

Finally, in terms of racial prejudice, plaintiffs contend that defense counsel used inflammatory rhetoric by making use of words such as "slavery" and "overseers" during opening statements when there had been no evidence on these terms at that time. This argument is groundless. During opening statements, counsel is allowed to "make a full and fair statement of

that party's case and the facts the party intends to prove." MCR 2.507(A). See also *Wiley*, 257 Mich App at 503. In this case, *plaintiffs'* counsel first introduced the word "slavery" during his opening statement, stating that the evidence would show that Peery "felt like, what is this, slavery, like you're my master or something . . . ." Having raised the topic of "slavery," plaintiffs cannot contend that defense counsel was improper for responding to the issue. See *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003); *Carbonnell v Bluhm*, 114 Mich App 216, 221; 318 NW2d 659 (1982). Moreover, in light of Peery's anticipated testimony on "slavery" and "slave masters" as set forth at her deposition, it was entirely proper for defense counsel to make plain to the jury during opening statements that the evidence would show that any reference to "slavery" and related terms was coming entirely from plaintiffs' perception of Walker's words and that there was no evidence that Walker actually used such words. In this respect, more fully, defense counsel stated:

> You're gonna hear that certain words have been said; and you're gonna hear one side of this case try to characterize what those means [sic] – what those words mean in order to make them sound more severe than they were; but nobody talked about slaves and manor houses. Nobody ever – and the plaintiffs, they're gonna admit that. Nobody said anything about overseers and slavery, nobody said those kinds of things.

Ultimately, this statement was a fair representation of what the evidence showed, i.e., that Peery "felt" like Walker was a "twenty-first century slave master" but that neither Walker nor anyone else used such terms. On the facts of this case, there was absolutely nothing improper in defense counsel's mention of these terms during his opening statement. See MCR 2.507(A).

## C. PERSONAL ATTACKS

Next, plaintiffs contend that defense counsel levied personal attacks against plaintiffs' counsel with the following remarks during opening statements:

> [Harris] has not been offered a job back; and *[plaintiff's counsel] can blame it on us* all he wants . . . .

> Nobody said anything about overseers, slavery; nobody said those kinds of things. Those are the things that you're learning about *from the lawyers* to take what is a moderate case and make it sound a lot worse than it is . . . . [Emphasis added.]

Personal attacks on counsel are improper. *Powell*, 241 Mich App at 81. "Irrelevant, disparaging and accusatory remarks divert the attention of the jury from the merits of the case." *Bd of Co Rd Com'rs of Wayne Co*, 394 Mich at 138. However, as noted, the test for misconduct is whether counsel's conduct shows "a deliberate course of conduct aimed at preventing a fair and impartial trial or where counsel's remarks were such as to deflect the jury's attention from the issues involved and had a controlling influence on the verdict." *Ellsworth*, 236 Mich App at 191-192. In other words, isolated and fleeting attacks do not typically necessitate a new trial. *Bd of Co Rd Com'rs of Wayne Co*, 394 Mich at 138; *Powell*, 241 Mich App at 82 n 12.

In this case, from a lengthy trial, plaintiffs have brought forth two purported "attacks" on plaintiffs' counsel by defense counsel. Considering the trial as a whole, these isolated and rather

innocuous remarks certainly did not deprive plaintiffs of a fair trial. To the contrary, the remarks were responsive to the representations of the evidence made by plaintiffs' counsel in his opening statement, which involved arguments that Walker was somehow responsible for Harris's lack of recall rights as well as allusions to terms never purported to have been said by Walker, such as "slavery." These responsive remarks by defense counsel did not shift the jury's attention from the evidence to counsel's personality. See *People v Phillips*, 217 Mich App 489, 497-498; 552 NW2d 487 (1996). Moreover, we note that this was a contentiously litigated case by all the attorneys. Even if the passing remarks by defense counsel can somehow be construed as an "attack," plaintiffs' counsel fought back with at least equal vigor and cannot now claim unfair prejudice based on defense counsel's conduct. See *Guider v Smith*, 157 Mich App 92, 103; 403 NW2d 505 (1987); *Dunn v Lederle Labs*, 121 Mich App 73, 90; 328 NW2d 576 (1982).

### D. AL-CAR CONTRACT & BOARD RESOLUTION

Next, plaintiffs contend on appeal that defense counsel made improper references to the Al-Car contract and related Board resolutions. First, plaintiffs assert that, during closing arguments, defense counsel stated that "I have seen the resolution from the County approving the contract." According to plaintiffs, by making this statement, defense counsel used his own personal experience to comment on the evidence and to vouch for witness credibility. Second, plaintiffs contend that defense counsel improperly stated during closing arguments, in reference to the contract, that "I don't have any evidence and I can't tell you why not . . . ."

Counsel's arguments must have a basis in the facts and evidence presented at trial. See *Badalamenti*, 237 Mich App at 290-291. And, counsel cannot draw from his or her own outside experiences when arguing to the jury. *Lynd v Charter Twp of Chocolay*, 153 Mich App 188, 199; 395 NW2d 281 (1986). In this case, defense counsel did not list the contract and resolution on defendants' exhibit list in compliance with the scheduling order and, for this reason, the documents were not admitted into evidence. While the documents were not introduced, numerous witnesses testified that an approved contract and Board resolution existed. Celeste Bell and Walker both testified that they personally saw the approved contract and the resolution. Purcell testified that "to his knowledge" there was a contract. And, Bell testified that the Board resolutions were available on the County's website.

In light of this evidence, there was nothing improper in defense counsel's closing summation of the evidence, which was, in part, as follows:

> Celeste Bell said you have to have a written contract and it has to be approved by the County. Two thousand thirteen is the time frame we're talking about. Celeste Bell and Steve Walker and somebody else all testified I have seen the written contract for the 2012 year. I have seen the resolution from the County approving the contract. Nobody's contradicted that testimony . . . .

In attempting to create some impropriety, plaintiffs have wholly taken defense counsel's remarks out of context. Specifically, plaintiffs indicate in their brief that "defense counsel stated to the jury, 'I have seen the resolution from the County approving the contract.' " However, in context, it is obvious that defense counsel was not speaking about his own personal knowledge of the resolution, but of the testimony offered by Walker and Bell. Defense counsel makes this plain

with his statement that "[n]obody's contradicted *that testimony*" (emphasis added). This was not improper argument and there was no attempt by defense counsel to vouch for witness testimony or the existence of the resolution.

A closer question is presented by defense counsel's assertion, in reference to the contract, that "*I don't have any evidence and I can't tell you why not*, but, at the end of the day, I have testimony" (emphasis added). As noted, defense counsel did not include the contract on defendants' exhibit list and, for this reason, defendants were precluded from introducing the contract at trial. Typically, it would be improper to suggest inadmissible evidence to the jury. See MRE 103(c); *Bishop v St John Hosp*, 140 Mich App 720, 726; 364 NW2d 290 (1984). However, on the facts of this case, plaintiffs opened the door to defense counsel's remarks on the contract's existence as well as comments on defendants' failure to produce the document at trial. See *Miner v Lorman*, 66 Mich 530, 532; 33 NW 866 (1887); *Bishop*, 140 Mich App at 726; *Carbonnell*, 114 Mich App at 221; *Joba Const Co, Inc v Burns & Roe Inc*, 121 Mich App 615, 636; 329 NW2d 760 (1982).

In particular, plaintiffs' counsel questioned Harris about the existence of a contract as well as her review of defendants' exhibit list and whether the contract appeared on the exhibit list. Likewise, plaintiffs' counsel cross-examined Walker, Bell, and Purcell about the contract, asking, not only if a contract existed, but why it had not been brought to court and why the document had not been included on defendants' exhibit list. In response to this questioning, Walker testified that he had not prepared the exhibit list and Bell noted that plaintiffs' counsel had a copy of the contract. Then, during closing arguments, plaintiffs emphasized the fact that the contract had not been introduced at trial, stating for example: "And there's no contract in evidence. All this time to prepare for this day; and there's no contract in evidence from them."

Considering counsel's questions and closing arguments, plaintiffs invited defense counsel's passing statement, in reference to the contract, that "I don't have any evidence and I can't tell you why not . . . ." Defense counsel's brief statement was responsive to plaintiffs' remarks and does not merit reversal. See *Miner*, 66 Mich at 532; *Carbonnell*, 114 Mich App at 221; *Joba Const Co, Inc*, 121 Mich App at 636. Indeed, ultimately, defense counsel stated nothing that plaintiffs had not elicited with their own examination of witnesses—namely, that the document had not been admitted into evidence and those on the defense side of the case did not have an explanation for this oversight.

Moreover, even if defense counsel's remarks and questions regarding the contract and resolution were improper, plaintiffs would not be entitled to relief. The existence of a contract approved through a Board resolution was an ancillary issue at trial, relevant only to Harris's WPA claim insofar as the lack of contract would make any payment to Al-Car improper and this alleged impropriety formed the basis for Harris's complaints to the FBI regarding Walker's supposed misappropriation of funds. But, under the WPA, it does not matter whether Walker actually violated the law and thus it does not matter whether a contract actually existed. That is, an individual "need not necessarily report an actual violation of a law to receive protection" under the WPA. *Pace v Edel-Harrelson*, 499 Mich 1, 7; 878 NW2d 784 (2016). All that is required is "a suspected violation of a law." *Id.*

In this context, the contract was a peripheral issue and defense counsel's remarks about the contract did not affect the outcome. This is particularly true because the jury in fact determined that Harris was engaged in protected activity. Thus, plaintiffs cannot have been prejudiced by defense counsel's remarks relating to the contract because, on the only issue to which the contract was relevant, the jury ruled in plaintiffs' favor. See generally *Yost v Falker*, 301 Mich App 362, 366; 836 NW2d 276 (2013).

## E. COUNTY WEBSITE

Related to the contract issue, plaintiffs contend that it was improper for defense counsel to ask Celeste Bell whether the Board resolution was available on the County's website because the question invited the jury to visit the website and consider facts not in evidence. It is true that defense counsel asked Celeste Bell about the availability of Board resolutions on the County's website, prompting testimony from Bell that resolutions are "public documents" posted on the County's website. Plaintiffs did not object to Bell's testimony.

Contrary to plaintiffs' framing of the issue, defense counsel did not encourage the jury to visit the website or consider outside evidence and, considering the facts of this case, it is plain that this was not defense counsel's intent in questioning Bell about the County's website. In particular, we note that defense counsel elicited similar testimony from Harris to the effect that a resolution approving a contract would be available on the County's website. Following Harris's testimony, plaintiffs objected, contending that defense counsel had "exhorted the jurors to go online" and look for documents on the County's website. In response, defense counsel explained the purpose of this examination to the trial court's satisfaction as follows:

> Under the [WPA], in order to make a complaint and have it be legitimate in [sic] something that's protected activity, the person must have a reasonable belief that the complaint they made was actually a violation of law; and my argument is that (a) there was a contract so what she said was untrue; and (b) if she would have gone out and looked, she would have found that out for herself.

Defense counsel's explanation also provides a proper basis for the questions posed to Bell. That is, as noted under the WPA, even if there is not an actual violation of the law, an employee is protected for reporting a "suspected violation." *Pace*, 499 Mich at 7. However, an employee is not protected under the WPA for making a false report, MCL 15.362; and "[t]he suspected violation of the law is judged on a subjectively reasonable standard: the employee must have been acting in good faith and been subjectively reasonable in the belief that the conduct was a violation of the law." *Smith v Gentiva Health Servs Inc*, 296 F Supp 2d 758, 762 (ED Mich 2003). See also M Civ JI 107.04 ("Plaintiff must reasonably believe that a violation of law or a regulation has occurred."). It follows that defense counsel was at least arguably attempting to introduce admissible evidence by exploring—both through testimony from Harris and Bell—whether a contract and resolution existed and whether those materials would have been readily available to Harris. Good-faith efforts to introduce evidence do not constitute attorney misconduct. See *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999).

Moreover, as noted above, the contract and related resolution were peripheral issues at trial, and the jury in fact determined that Harris engaged in protected activity. On this record,

any impropriety by defense counsel regarding the contract or resolution approving the contract does not entitle plaintiffs to a new trial. See *Yost*, 301 Mich App at 366.

## F. JURY INSTRUCTIONS

Additionally, with respect to all of plaintiffs' claims of misconduct by defense counsel, we note that this was a thoroughly litigated case by both sides, during which the trial court repeatedly instructed the jury that the lawyers' comments, questions, and arguments did not constitute evidence and that the jury could only decide the case based on the evidence admitted at trial. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Zaremba Equip, Inc v Harco Nat Ins Co*, 302 Mich App 7, 25; 837 NW2d 686 (2013) (citation omitted). Even assuming some impropriety, whether considered individually or collectively, the remarks challenged by plaintiffs on appeal are such that the trial court's repeated instructions cured any potential error and plaintiffs are not entitled to a new trial on the basis of defense counsel's conduct. See *id.* Thus, the trial court did not abuse its discretion by denying plaintiffs' motion for a new trial on the basis of defense counsel's conduct and remarks at trial. See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 761; 685 NW2d 391 (2004).

## III. JNOV

Next, plaintiffs contend that they are entitled to JNOV with respect to their WPA claims. Specifically, plaintiffs maintain that the trial court should have granted their motion for JNOV because, in light of plaintiffs' undisputed job loss and the jury's finding of "protected activity," the only issue in dispute was the question of causation and, according to plaintiffs, the evidence of a causal connection between their protected activity and their job loss was "overwhelming." We disagree.

We review de novo a trial court's denial of a motion for JNOV. *Diamond v Witherspoon*, 265 Mich App 673, 681; 696 NW2d 770 (2005). "[A] motion for JNOV should be granted only when there was insufficient evidence presented to create an issue of fact for the jury." *Heaton v Benton Const Co*, 286 Mich App 528, 532; 780 NW2d 618 (2009). "In reviewing the decision on a motion for JNOV, this Court views the testimony and all legitimate inferences drawn from the testimony in the light most favorable to the nonmoving party." *Diamond*, 265 Mich App at 682. "If reasonable jurors could have honestly reached different conclusions, the jury verdict must stand." *Morinelli v Provident Life & Acc Ins Co*, 242 Mich App 255, 260-261; 617 NW2d 777 (2000).

The WPA establishes "a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law." *Whitman v City of Burton*, 493 Mich 303, 312; 831 NW2d 223 (2013). See also MCL 15.362. As explained by the Michigan Supreme Court, to make out a prima facie case that a defendant employer has violated the WPA, the plaintiff employee must show that:

> (1) The employee was engaged in one of the protected activities listed in the provision.

(2) the employee was discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment.

(3) A causal connection exists between the employee's protected activity and the employer's act of discharging, threatening, or otherwise discriminating against the employee. [*Wurtz v Beecher Metro Dist*, 495 Mich 242, 251-252; 848 NW2d 121 (2014) (footnotes omitted).]

If a plaintiff establishes a prima facie case, the burden then shifts to the defendant employer to offer a legitimate reason for the adverse employment action, and a plaintiff may then offer evidence to demonstrate that the defendant's purportedly legitimate reason is a mere pretext for unlawful retaliation. See *Debano-Griffin v Lake Co*, 493 Mich 167, 176-179; 828 NW2d 634 (2013); *Roulston v Tendercare (Mich), Inc*, 239 Mich App 270, 281; 608 NW2d 525 (2000).

In this case, the disputed question for purposes of plaintiffs' JNOV argument is whether a "causal connection" exists between plaintiffs' protected activity and the loss of plaintiffs' jobs at G-Card. See *Wurtz*, 495 Mich at 251-252. On appeal, contrary to the standard for considering a motion for JNOV, plaintiffs highlight only the evidence favorable to their position.[4] For instance, plaintiffs emphasize the temporal proximity between the protected activity and the reorganization of G-Card. They contend that Walker showed "anger" over this protected activity as evinced by a counseling memo to Harris on October 30 for an issue involving her time card and a November 1 memo to Harris indicating that her job duties would now be given to her in writing. In what they describe as a "smoking gun," plaintiffs also assert that, during a conversation with G-Card employee Tanieka Johnson, Walker said that he would bring Peery back to G-Card if she were not "in cahoots" with Harris.[5] Lastly, plaintiffs contend that there is no merit to the financial justifications offered by defendants for the reorganization of G-Card. In

_____

[4] More generally, on appeal, plaintiffs have failed to give any meaningful consideration to the evidence presented by defendants at trial. That is, contrary to MCR 7.212(C)(6), plaintiffs have failed to set forth anything resembling a "clear, concise, and chronological narrative" of the statement of facts. They certainly have not presented "[a]ll material facts, both favorable and unfavorable" in a manner that is "fairly stated without argument or bias." MCR 7.212(C)(6).

[5] Plaintiffs' discussion of the evidence relating to Tanieka Johnson is a prime example of plaintiffs' failure to view the evidence in the light most favorable to defendants as the nonmoving party. See *Diamond*, 265 Mich App at 682. That is, Peery testified that Johnson told her that Walker said Peery was "in cahoots" with Harris and that he would bring Peery back to G-Card if she were not "in cahoots." But, Walker denied making such a statement. And, Johnson denied that Walker told her that Peery was "in cahoots" with Harris or that he would bring Peery back if she were not "in cahoots" with Harris. Far from a "smoking gun," at most, there was a question of fact for the jury regarding the alleged "in cahoots" statement. See *Guerrero v Smith*, 280 Mich App 647, 669; 761 NW2d 723 (2008).

this respect, they accuse Walker of lying; they maintain that S-Grant funding was not cut and that S-Grant funding in fact increased in 2014.[6]

Considering plaintiffs' arguments, it is clear that plaintiffs presented some evidence at trial to establish a causal connection between the protected activity and elimination of plaintiffs' positions at G-Card. But, at most, this evidence gives rise to a question of fact regarding a causal connection, *Debano-Griffin*, 493 Mich at 176-179, and, when a question of fact exists, the jury's verdict cannot be disturbed by granting a JNOV motion. See *Heaton*, 286 Mich App at 532; *Morinelli*, 242 Mich App at 260-261. More specifically, in contrast to plaintiffs' proofs, defendants presented ample evidence to disprove plaintiffs' claim of a causal connection and to establish a legitimate financial reason for the reorganization of G-Card, which the jury could reasonably conclude was not rebutted by plaintiffs as a mere pretext. Indeed, plaintiffs' arguments mainly involve credibility challenges and issues relating to the weight of the evidence, and these issues were for the jury to decide.[7] See *Landin*, 305 Mich App at 544. Viewing the evidence in a light most favorable to defendants, reasonable jurors could have honestly decided in defendants' favor. *Diamond*, 265 Mich App at 682; *Morinelli*, 242 Mich App at 260-261. Thus, plaintiffs were not entitled to JNOV.

## IV. CROSS-APPEAL

Finally, we note that defendants have filed a cross-appeal raising several issues that would only be pertinent if the case were remanded for a new trial. Given our conclusion that plaintiffs are not entitled to a new trial, defendants' cross-appeal is moot and need not be

---

[6] It is true that, following additional notice of funds in 2014, the S-Grant funding increased for 2014 as compared to 2013. But, as discussed, defendants' evidence indicated that the S-Grant was not the only relevant grant. Moreover, while plaintiffs emphasize, with the benefit of hindsight, that S-Grant funding was ultimately slightly higher in 2014 than in 2013, this does not necessarily make defendants' conduct in the fall of 2013 unlawful. According to defendants' evidence, they were faced with uncertain S-Grant funding for the coming 2014 fiscal year and they were free to consider this uncertainty, along with other budgetary concerns, in their decision-making. See *Wurtz*, 495 Mich at 249-250 ("[T]the employer can make its decision for good reasons, bad reasons, or no reasons at all, as long as the reasons are not unlawful . . . ."); *Debano-Griffin*, 493 Mich at 180 (A "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.") (citation omitted).

[7] For example, it was for the jury to decide whether the counseling memo to Harris and the written job assignments demonstrated "anger" by Walker as alleged by plaintiffs or whether Walker's conduct was a legitimate response to discrepancies in Harris's time card and Harris's complaints about her job duties. See *West v General Motors Corp*, 469 Mich 177, 187; 665 NW2d 468 (2003) ("The fact that a plaintiff engages in a 'protected activity' under the [WPA] does not immunize him from an otherwise legitimate, or unrelated, adverse job action.").

decided.  See *Tenneco Inc v Amerisure Mut Ins Co*, 281 Mich App 429, 472; 761 NW2d 846 (2008); *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 112; 776 NW2d 114 (2009).

Affirmed.  Having prevailed in full, defendants may tax costs pursuant to MCR 7.219.


/s/ Michael J. Talbot
/s/ Kathleen Jansen
/s/ Joel P. Hoekstra